**Bertram ZWEIBON et al., Appellants,**

v.

**John N. MITCHELL, Individually and as Attorney General of the United States, et al.**

No. 78–1348.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1979.

Decided July 12, 1979.

49. J.A. II at 378.

**1174**

Nathan Lewin, Washington, D.C., with whom Martin D. Minsker and Jamie S. Gorelick, Washington, D.C., were on brief, for appellants.

R. John Siebert, Atty., Dept. of Justice, Washington, D.C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., at the time the brief was filed, Earl J. Silbert, U. S. Atty., Washington, D.C., at the time the brief was filed, and Robert E. Kopp and Larry L. Gregg, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellees.

Before WRIGHT, Chief Judge, ROBINSON, Circuit Judge, and GESELL,* District Judge.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

Appellants, members of the Jewish Defense League (JDL), sued former Attorney General John N. Mitchell and nine agents of the Federal Bureau of Investigation (FBI) for damages for wiretapping of the JDL's New York office in 1970 and 1971. The District Court dismissed the case because it refused to apply retroactively the constitutional requirement of a warrant for national security wiretaps that was articulated in *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and in *Zweibon v. Mitchell (Zweibon I)*, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Similarly, the District Court limited to prospective effect the conclusion of the plurality in *Zweibon I* that some of the procedures and remedies of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [1] are relevant to those national security surveillances that violate the Fourth Amendment. Since both holdings dispose of only part of appellants' complaint, however, there was no basis for dismissing the entire suit. Moreover, we de-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Pub.L. No. 90–351, 82 Stat. 212 (1968) (codified at 18 U.S.C. §§ 2510–2520 (1976)).

cline to restrict the constitutional warrant requirement of *Keith* and *Zweibon I* to prospective effect in damage suits like this one. Finally, we affirm the District Court's ruling on the *Zweibon I* plurality's view of the statutory question.

### I

The facts underlying this action are set out in detail in our opinion in *Zweibon I,* so we will note only the salient points here. In the late 1960s the JDL staged occasionally violent demonstrations against Soviet installations and personnel in New York to protest the treatment of Jews in Russia. The JDL program drew complaints from the Soviets, along with thinly veiled threats of reprisal against Americans in the Soviet Union.[2] In addition, suspected and anticipated JDL actions constituted violations of several criminal statutes.[3] In October 1970, and between January and July 1971, the Government wiretapped six telephones at JDL headquarters.

The existence of the JDL wiretaps came to light in June 1971 during the trial of several JDL members on criminal charges,[4] and this suit for damages under the Fourth Amendment and Title III followed. The District Court granted summary judgment in favor of defendants on July 20, 1973,[5] but this court, acting *en banc,* reversed that ruling in *Zweibon I.* Drawing on the Supreme Court's decision in *Keith,* we found that the Government could not constitutionally place a wiretap on appellants' telephones without first acquiring a judicial warrant.[6] In September 1977 we also reversed the District Court's decision that the plaintiffs were not entitled to a jury trial.[7] The ruling we consider today came in response to renewed motions for summary judgment by appellees.[8]

### II

The problem of determining the retroactive effect of a "new" judicial ruling goes to the heart of what courts do. Chief Justice Hughes described such decisions as "among the most difficult of those which have engaged the attention of [the] courts."[9] The traditional view is that decisions overruling prior holdings or announcing novel doctrine must be applied to all subsequent cases, even if the later cases involve incidents that took place before the crucial judicial ruling.[10] In such cases, ac-

---

**2.** *See* Joint Appendix (JA) 81–83, 88–89, 112–113, 148–149 (Department of State documents detailing Russian anger over JDL activities).

**3.** *See* JA 68–69 (Sept. 14, 1970 memorandum from FBI Director J. Edgar Hoover citing "violence" and "injury to private citizens and law enforcement officers" from JDL activities and JDL threat to hijack airplanes); brief for respondents, Addendum at 3 (April 1971 State Department cable referring to Russian protest over alleged JDL bombing of Soviet office in New York).

**4.** *See United States v. Bieber,* 71 C.R. 479 (E.D. N.Y.); *United States v. Joffee,* 71 C.R. 480 (E.D.N.Y.).

**5.** *Zweibon v. Mitchell,* 363 F.Supp. 936 (D.D.C. 1973).

**6.** *Zweibon v. Mitchell (Zweibon I),* 170 U.S. App.D.C. 1, 18–61, 516 F.2d 594, 611–654 (1975) *(en banc), cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

**7.** *In re Zweibon (Zweibon II),* 184 U.S.App.D.C. 167, 565 F.2d 742 (1977) *(per curiam).*

**8.** *Zweibon v. Mitchell,* 444 F.Supp. 1296 (D.D.C. 1978). Pending the Supreme Court's decision in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), appellees did not advance in this action their earlier contention as to official immunity. Due to its decision on retroactivity, the District Court also did not reach appellees' "good faith" defense. *Zweibon v. Mitchell, supra,* 444 F.Supp. at 1298.

**9.** *Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 374, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940).

**10.** *See* 1B Moore's Federal Practice ¶ 0.402, at 171 (2d ed. 1974). Justice Holmes stated the proposition quite strongly in *Kuhn v. Fairmont Coal Co.,* 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L.Ed. 228 (1910) (Holmes, J., dissenting): "I know of no authority in this court to say that in general * * * decisions shall make law only for the future. Judicial decisions have had retrospective operation for near a thousand years." *See also* Note, *Prospective Overruling and Retroactive Application in the Federal Courts,* 71 Yale L.J. 907 (1962).

cording to Blackstone, "judges do not pretend to make a new law, but to vindicate the old one from misrepresentation." [11] Thus for Blackstone judicial overruling reflects not the decision that the previous approach was *"bad law,* but that it was *not law."* [12]

For many years the Supreme Court only occasionally ignored the Blackstonian view of retroactivity by restricting reversal of earlier law to prospective effect.[13] In the 1960s, however, the Court established prospectively a number of constitutional rules protecting the rights of criminal defendants.[14] Prospective overruling can preserve the flexibility of judge-made law without causing unacceptable social upheaval, but the technique has two substantial draw-

backs. First, it carries all the earmarks of legislative action with none of the democratic procedures.[15] Second, it is difficult as a logical proposition to maintain that a new doctrine should be established, yet that prior doctrine applies to cases reaching the courts after that decision so long as they involve events that occurred before that point. As Justice Harlan wrote:

> If a "new" constitutional doctrine is truly right, we should not reverse lower courts which have accepted it; nor should we affirm those which have rejected the very arguments we have embraced. * * * [16]

Historically, prospectivity has been less common in civil than in criminal cases.[17]

**11.** 1 W. Blackstone, Commentaries *70 (Cooley's 4th ed. 1899).

**12.** *Id.* (emphasis in original). A similar note with respect to unconstitutional legislation was struck by Justice Field in *Norton v. Shelby County,* 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886): "[Such an] act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *See also United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). For a more modern explanation of the presumption in favor of retroactivity, *see* B. Cardozo, The Nature of The Judicial Process 142–143 (1921).

**13.** *See, e. g., Douglass v. County of Pike,* 101 U.S. (11 Otto) 677, 687, 25 L.Ed. 968 (1879); *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

**14.** *See, e. g., Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) (prospective application of exclusionary rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (prospective application of rule of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), on presence of counsel at police interrogation); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (prospective application of rule of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), on right to counsel at lineup).

**15.** *See* Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility,* 28 Hastings L.J. 533, 536–537 (1977); Mishkin, *Foreword: The High Court, The Great Writ,*

*and the Due Process of Time and Law,* 79 Harv.L.Rev. 56, 60–62 (1965); Note, *supra* note 10, 71 Yale L.J. at 931–932.

**16.** *Desist v. United States,* 394 U.S. 244, 259, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

**17.** *See Dasho v. Susquehanna Corp.,* 461 F.2d 11, 20 (7th Cir.), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972) (noting "almost no suggestion" in criminal cases announcing prospective rules "that this line of authority should be applied to civil litigation").

The Supreme Court has permitted prospectivity in civil cases involving interpretations of law that might void municipal bonds, *e.g., Gelpcke v. Dubuque,* 68 U.S. (1 Wall.) 175, 17 L.Ed. 520 (1863); *Douglass v. County of Pike, supra* note 13; *Taylor v. Ypsilanti,* 105 U.S. (15 Otto) 60, 26 L.Ed. 1008 (1881); *Anderson v. Santa Anna,* 116 U.S. 356, 6 S.Ct. 413, 29 L.Ed. 633 (1886); *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); *City of Phoenix v. Kolodzeijski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *see also Chicot County Drainage District v. Baxter State Bank, supra* note 9 (denying retroactive effect to prevent bondholders from voiding renegotiation of obligations), or that might generally work an undue burden on individual litigants, *e.g., Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (allowing tort suit to proceed despite intervening decision making different statute of limitations applicable); *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (first interpretation of federal voting statute); *England v. State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (announcing rule that submission of fed-

This is at least partly due to the potential flood of *habeas corpus* petitions that looms if a court recognizes retroactively a procedural or substantive right of criminal defendants.[18] No such threat arises in civil litigation where a retroactive decision can affect only suits pending in the courts or not yet brought, but cannot be raised by previously unsuccessful litigants. The prospectivity determination in both civil and criminal cases, however, remains a pragmatic one that turns on the expected impact of a retroactive overruling on the society and legal system. Retroactivity is the rule, but not at the expense of other important values.[19]

Our disagreement with the District Court can be traced in part to the complexity of this suit. Appellants do not present one cause of action, but rather seek damages under both Title III and the Fourth Amendment. And the constitutional basis for their suit involves both the warrant requirement of *Keith* and *Zweibon I* and the question whether the wiretap was reasonable even if no warrant was necessary. We think the retroactivity decision must be tailored to each particular cause of action. More important, we emphasize that the suit before us is not a criminal case, but a civil damage action alleging a constitutional tort. We must take care that in considering retroactivity we appreciate the context of our determination.

There can be no question of novelty, and hence no retroactivity problem, as to two features of this case. First, because the "reasonableness" requirement of the Fourth Amendment was recognized at the time of the wiretap as a controlling standard for national security surveillances,[20] the District Court should have applied that standard to the wiretap as initiated and as conducted for six months. Second, in *Zweibon I* we assumed without deciding that the surveillance concerned national security matters,[21] and suggested that the District Court might inquire into this issue on remand.[22] Since then appellants have marshalled additional evidence suggesting that the primary motive behind the wiretap was criminal investigation, not national security.[23] If this proposition can be established at trial, the violation of the terms of Title III would be apparent, because appellees do not contend that they followed statutory procedures; and since the statute was enacted two years before the JDL surveillances, there would be no retroactivity question.[24]

### III

With respect to the retroactivity of the Fourth Amendment warrant requirement announced by *Keith* and *Zweibon I*, more extended analysis is required. In *Chevron*

---

eral claims to state court bars subsequent action in federal court, but not applying rule to appellants).

**18.** *Cf. Desist v. United States, supra* note 16, 394 U.S. at 260–269, 89 S.Ct. 1030.

**19.** *See Chicot County Drainage District v. Baxter State Bank, supra* note 9, 308 U.S. at 374, 60 S.Ct. 317.

**20.** *See Halperin v. Kissinger,* 196 U.S.App.D.C. ——, ——, 606 F.2d 1192, 1201–1202 (1979).

**21.** *See Zweibon I, supra* note 6, 170 U.S.App. D.C. at 19, 516 F.2d at 612 n.39.

**22.** *See id.,* 170 U.S.App.D.C. at 81 n.274, 516 F.2d at 671 n.274: "[T]he trial court on remand will probably have to take additional testimony * * * in order to ascertain whether appellees in fact believed these wiretaps were being utilized to gather national security intelligence

rather than to obtain evidence for criminal prosecutions * * *."

**23.** Appellee Mitchell stated in a deposition that the Justice Department was concerned that the JDL would undertake assaults, bombings, and airplane hijackings, JA 232–233, and that the State Department was pressing his office for criminal prosecution of JDL members, JA 260, 261. In addition, the two FBI memoranda requesting wiretap authorization cite several suspected criminal violations. JA 68–71. Even without this evidence Judges McGowan and Robb concluded in *Zweibon I* that the surveillance should be viewed as part of a criminal investigation. 170 U.S.App.D.C. at 88–89, 516 F.2d at 681–689.

**24.** *See Halperin v. Kissinger, supra* note 20, 196 U.S.App.D.C. at —— ——, 606 F.2d at 1204–1205.

*Oil Co. v. Huson*[25] the Supreme Court offered a useful three-step test for prospectivity which was followed by the District Court in the case before us: (A) Did the court directly overrule precedent or announce a rule "not clearly foreshadowed"? (B) Is prospective application consistent with the "purpose and effect" of the rule? (C) Are there equitable considerations requiring prospective application? Because each of these considerations will have different effect in different cases, no single factor is controlling.

### A

Appellants dispute the District Court's view that the application of the Fourth Amendment's warrant requirement to national security surveillances was "not clearly foreshadowed" by judicial decisions before these wiretaps were installed. Before *Keith* the Supreme Court had never ruled on the need under the Constitution for a warrant in national security surveillances,[26] but appellants urge that the trend of Supreme Court decisions was clear and that disagreement among the lower courts on this question could not justify the assumption that warrantless wiretapping was constitutional.[27] Moreover, appellants point to a memorandum to appellee Mitchell from the Solicitor General in 1969 that noted the Supreme Court's "great hostility" to attempts to limit the rights of those "suspected of engaging in subversive activities,"

and counselled against a court test of Executive power to wiretap without a warrant.[28]

■ Since *Keith* and *Zweibon I* did not overrule any earlier decisions, we must determine whether application of the warrant requirement to national security cases was "not clearly foreshadowed." The Supreme Court has phrased this question in terms of whether a new rule represents the resolution of "complex issues of first impression"[29] or "an avulsive change which caused the current of the law thereafter to flow between new banks."[30] *Keith* and *Zweibon I* were cases of first impression, but the complexity and avulsiveness of their holdings on the Fourth Amendment's warrant requirement are not manifest. Statements by the Supreme Court in the late 1960s certainly demonstrated great concern over unrestrained warrantless wiretapping.[31] Extension of that concern to the national security sphere was certainly likely, though perhaps not inevitable.[32]

We think the approach taken by the Seventh Circuit in *Dasho v. Susquehanna Corp.*[33] is appropriate here. That appeal challenged the trial court's refusal to permit a trial to the jury in a stockholder's derivative action. Then-Judge Stevens' opinion for the panel applied retroactively the Supreme Court's holding in *Ross v. Bernhard*[34] that stockholders have a right to a jury trial in such cases. Even though

---

**25.** 404 U.S. 97, 106–107, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

**26.** *See Katz v. United States*, 389 U.S. 347, 358 n.23, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**27.** In an April 1971 speech, while the JDL wiretaps were still in place, appellee Mitchell commented on that division among the lower courts. JA 327–328.

**28.** JA 504–509.

**29.** *Allen v. State Board of Elections, supra* note 17, 393 U.S. at 572, 89 S.Ct. 817.

**30.** *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 499, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

**31.** *See Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Gior-*

*dano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *Taglianetti v. United States*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969); *Katz v. United States, supra* note 26; *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

**32.** This seems especially true since in *Alderman v. United States, supra* note 31, the Supreme Court made no distinction in its application of the Fourth Amendment to defendants charged with conspiring to transmit murderous threats in interstate commerce, and to defendants alleged to have been engaged in espionage.

**33.** *Supra* note 17.

**34.** 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

there had previously been a split among the circuits on that issue, the *Dasho* court concluded that *Ross* "did not establish a new principle of law," but "merely resolved a conflict in the circuits consistently with the Court's interpretation of prior law." [35] We believe that *Keith* and *Zweibon I* also did not announce a new principle of law, but simply applied the constitutional warrant requirement to national security situations.[36] As a result, we cannot say that the outcome in those cases was not clearly foreshadowed.

### B

The second *Chevron Oil* standard focuses on whether retroactive overruling will promote or hinder the substantive rule announced in the crucial decision. Echoing the leading case on prospectivity of criminal rules, the District Court concluded that "[n]o amount of monetary damages can restore the privacy which was improperly invaded by the action of defendants * *." [37] Accordingly, retroactive application of the warrant rule of *Keith* and *Zweibon I* in this case was not deemed to support the purpose of that rule. The court suggested that

**35.** 461 F.2d at 21.

**36.** Appellees' claimed reliance on prior Executive practice does not bear directly on our determination, since Executive actions cannot represent an authoritative source of constitutional standards. *Zweibon I, supra* note 6, 170 U.S.App.D.C. at 25–26, 516 F.2d at 618–619. And as to appellees' reference to lower court opinions, we note Cardozo's candid reflection:

We will not help out the man who has trusted to the judgment of some inferior court. In his case, the chance of miscalculation is felt to be a fair risk of the game of life, not different in degree from the risk of any other misconception of right or duty. * * *

B. Cardozo, *supra* note 12, at 147–148 (footnote omitted).

**37.** *Zweibon v. Mitchell, supra* note 8, 444 F.Supp. at 1300. *Compare Linkletter v. Walker, supra* note 14, 381 U.S. at 637, 85 S.Ct. at 1742 ("[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.").

**38.** *Zweibon v. Mitchell, supra* note 8, 444 F.Supp. at 1300. The District Court also claimed that retroactive application of the war-

there might be a stronger basis for retroactive application of the warrant requirement in a criminal case where the exclusionary rule "constitutes a substantial and persuasive deterrent of government activity which is questionably illegal." [38]

The District Court's overemphasis on criminal law concepts in rejecting retroactivity in this *civil* case has led it into error. The principle announced in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* [39] is that monetary damages are an entirely appropriate remedy for Fourth Amendment violations. After *Bivens* the Fourth Amendment cannot be said to be restricted to procedural rights in a criminal prosecution or to civil injunctive proceedings. In this suit the terms of that constitutional provision, including the warrant requirement, function like any standards for conduct that might involve tort liability. Unlike the District Court, we think that a stronger case for prospectivity, rather than retroactivity, might be made in a criminal case involving the exclusionary rule, where the prophylactic purpose of that rule cannot be served by retroactive application and where the costs to society of

rant requirement in a civil damage action would offend the policies behind official immunity doctrines. *Id.* We consider the District Court's concern on this score misplaced. The second *Chevron Oil* criterion focuses our attention on the purpose of the warrant requirement that is to be applied retroactively, not on the purpose of the immunity defense. Nevertheless, we disagree with the trial court's conclusion on the relationship between retroactivity and immunity doctrine. The availability of an immunity defense is unaffected by the outcome on the retroactivity issue, so we see no grounds for the fear that the purposes of the defense can be defeated by retroactive application of the warrant rule. Indeed, because immunity doctrine provides a defense for some individuals who might otherwise be held liable for acts undertaken before announcement of the warrant rule, *see* text at notes 48–49 *infra*, it supports retroactivity by preventing possibly unfair treatment of those defendants.

**39.** 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

retroactivity may be far greater.[40] In a damage action the effect of the warrant rule articulated in *Keith* and *Zweibon I* is to recognize a substantive right to compensation for injury.[41] Retroactive application would therefore seem fully consonant with those decisions and *Bivens*. That our ruling might have an incidental deterrent effect on official conduct in the future hardly establishes that retroactive application is improper because it will retard the effectiveness of the *Bivens* doctrine.[42]

■ But the analogy between this case and traditional tort doctrine may not be complete. Courts have indeed held tort defendants to a standard of conduct they could not have known before they performed the actions giving rise to liability.[43] The basis for such rulings, however, is the conviction that the standards for tort liability probably have little impact on actual conduct,[44] and that if a retroactive standard is reasonable, "the conduct of right-minded men would not have been different if the rule embodied in the decision had been announced by statute in advance."[45] The analogous proposition that Fourth Amendment rules have only a minor impact on conduct may not be apt, since the stan-

dards of the Fourth Amendment were considered, though perhaps incorrectly gauged, in establishing the Government's policy on national security wiretaps.[46] Moreover, a clear purpose of the Fourth Amendment is to affect official conduct.

■ Thus on this second *Chevron Oil* criterion we find that conflicting considerations yield no clear answer to the prospectivity question. As a standard of conduct to be applied in a civil tort suit, the warrant requirement is presumed to apply retroactively. To the extent that the earlier standard, as understood, was the actual basis for the challenged surveillance, equitable concerns might be seen to require prospectivity only. Accordingly, we must explore the fairness of retroactivity in this situation.[47]

C

■ The central equitable concern in prospectivity decisions in damage actions is whether the defendants had notice of the new rule. If a truly new standard for liability has been promulgated, how can people be held to that rule for conduct preceding its announcement? In this case,

---

**40.** *See* text at note 17 *supra.*

**41.** *See Bivens, supra* note 39, 403 U.S. at 397, 91 S.Ct. at 2005: "[P]etitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." Thus the Supreme Court's refusal in *Desist v. United States, supra* note 16, to give retroactive effect to the warrant requirement for wiretapping in criminal prosecutions announced in *Katz v. United States, supra* note 26, flowed from the deterrent purpose behind the exclusionary rule of *Katz.* Retroactive application obviously does not enhance such deterrence. Accordingly, we do not think that *Desist* dictates our decision today.

**42.** *See Dasho v. Susquehanna Corp., supra* note 17, 461 F.2d at 21.

**43.** A famous example is *Johnson v. Cadillac Motor Car Co.,* 221 F. 801 (2d Cir. 1915), where an automobile buyer sued the manufacturer for failing to inspect the car for defects. The Second Circuit ordered the District Court to dismiss the case, but before the lower court did so the New York Court of Appeals held for the first time that manufacturers did have a duty to

inspect their cars for defects. *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916). The Second Circuit then reversed itself and upheld plaintiff's claim in *Johnson v. Cadillac Motor Car Co.,* 261 F. 878 (2d Cir. 1919). *See Vandenbark v. Owens-Illinois Glass Co.,* 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941) (dismissed suit for damages for disease contracted while employed by defendant is reinstated because Ohio Supreme Court subsequently recognized tort action for occupational diseases).

**44.** *See* B. Cardozo, *supra* note 12, at 145–146; Traynor, *supra* note 15, 28 Hastings L.J. at 545–546.

**45.** B. Cardozo, *supra* note 12, at 143.

**46.** *See* JA 308–315 (Memorandum of May 6, 1969 to FBI Director from Attorney General).

**47.** *See Desist v. United States, supra* note 16, 394 U.S. at 251, 89 S.Ct. at 1035 (fairness considerations enter "only when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity").

however, where there was no "avulsive" change of law, the qualified immunity available to appellees ensures that no such inequitable result can occur. As we state today in *Halperin v. Kissinger*, Government officials sued for alleged violations of Title III or the Constitution in the performance of their official duties may offer as an affirmative defense (1) that they had reasonable grounds to believe their actions were legal, and (2) that there is no evidence that they acted in bad faith.[48] The first ground clearly covers the fairness problems we might face with this case. By establishing immunity for actions reasonably thought to be legal, there can be no danger that a defendant will be held to a standard of conduct he could not have known, so long as there is no showing that he acted in bad faith. And if bad faith were demonstrated there would be little weight to any individual's equitable claim for restricting *Keith* and *Zweibon I* to prospective effect.[49]

▬▬ Consequently, we refuse to bar application of the warrant requirement of *Keith* and *Zweibon I* to this case. To do so would deny appellants the opportunity to seek compensation for constitutional deprivations they may have suffered while providing only a redundant protection for appellees. In such a situation there is no basis

for straying from the presumption that judicial decisions operate both prospectively and retroactively.[50]

### IV

▬▬ The District Court also denied retroactive effect to the conclusion of the plurality in *Zweibon I* that the "procedures and remedies" of Title III should apply to unconstitutional national security wiretaps.[51] We believe that the *Chevron Oil* standards support that ruling.

We think it is plain from the opinion of the *Zweibon I* plurality that its position on the statutory question was not clearly foreshadowed. The plurality noted that *Keith*, the closest precedent, "offers only ambiguous guidance" on the impact of Title III on unconstitutional national security surveillances, and acknowledged "some merit" in the District Court's view that *Keith* completely bars application of Title III to national security wiretaps.[52] According to the plurality, the language of the statute and the legislative history are also "somewhat ambiguous" on this point.[53] In addition, there had been no judicial comment on the relationship between the Fourth Amendment's warrant requirement in national security situations and the provisions of Title III. The statutory issue was thus one of

**48.** *Halperin v. Kissinger, supra* note 20, 196 U.S.App.D.C. at ——–——, 606 F.2d at 1209–1210.

**49.** Our rejection of the claim that *Keith* and *Zweibon I* should only be applied prospectively because they were not clearly foreshadowed, *see* text at notes 26–36 *supra*, should not be seen to undercut a claim of reasonable grounds for believing the legality of one's actions on the immunity issue. Contradictory lower court rulings might not establish that a decision was not clearly foreshadowed and should not have retroactive effect, but such a split of decisions might provide reasonable grounds for taking actions based on one or the other position for official immunity purposes.

**50.** In *Weinberg v. Mitchell*, 588 F.2d 275 (9th Cir. 1978), the Ninth Circuit refused to apply retroactively the warrant requirement of *Keith* after reviewing the *Chevron Oil* standards. Our disagreement with that court focuses on two points: (1) We do not think that the rule of *Keith* was not clearly foreshadowed, and (2) we believe that because qualified immunity protects potential defendants acting in good faith and in accordance with a reasonable understanding of applicable law, equitable considerations favor retroactivity to provide compensation for constitutional injury.

**51.** *Zweibon v. Mitchell, supra* note 8, 444 F.Supp. at 1301. According to the *Zweibon I* plurality, national security surveillances that were subject to the Fourth Amendment's warrant requirement should also be held to Title III's procedures for acquiring a warrant, for judicial oversight of the surveillance, for record keeping, and for post-wiretap notification of surveillance targets, and the statute's civil remedy should be available in such instances. *Zweibon I, supra* note 6, 170 U.S.App.D.C. at 75–76, 516 F.2d at 668–669.

**52.** *Zweibon I, supra* note 6, 170 U.S.App.D.C. at 67, 69, 516 F.2d at 660, 662.

**53.** *Id.*, 170 U.S.App.D.C. at 78, 516 F.2d at 671.

first impression, and was quite complex, involving sophisticated analysis of *Keith* and of the legislative record.[54] The plurality's application of Title III to unconstitutional national security surveillance represented the sort of sharp break in the law which should be restricted to prospective effect.

In light of our conclusion in this case that the constitutional warrant requirement should have retroactive effect, the second and third *Chevron Oil* criteria support only prospective application of the position that Title III procedures and remedies are relevant to unconstitutional national security surveillances. Like the *Bivens* doctrine discussed above, the procedures and remedies of Title III have two dominant purposes: (1) to prevent or deter improper invasions of privacy, and (2) to provide compensation when such invasions occur. The deterrent purpose of Title III is necessarily forward-looking and hence not contingent upon retroactive application. And so long as plaintiffs have the opportunity to seek redress under the *Bivens* line of cases, we will not frustrate the compensatory purpose of the statute by denying retroactive effect to the view of the *Zweibon I* plurality involved here.[55] Finally, the availability of the constitutional remedy dilutes any equitable claim of these plaintiffs on this point.[56]

Accordingly, the judgment of the District Court is reversed on the retroactivity of the Fourth Amendment's warrant requirement and affirmed on the statutory question, and the case is remanded for further proceedings.[57]

*So ordered.*

**54.** *See Allen v. State Board of Elections, supra* note 17, 393 U.S. at 572, 89 S.Ct. 817.

**55.** This is particularly true of the procedural requirements of Title III. For the purposes of the retroactivity determination, we follow the *Zweibon I* plurality in considering together the procedural and remedial aspects of Title III. 170 U.S.App.D.C. at 71, 73, 76, 78, 516 F.2d at 664, 666, 669, 671. At one point the plurality does urge that "even if the *procedures* of Title III were inapplicable to national security wiretaps, the *remedies* of Title III should apply * * *." *Id.,* 170 U.S.App.D.C. at 71, 516 F.2d at 664 (emphasis in original). This was not, however, the eventual position of the plurality, and we consider that statement as merely one step in the opinion's argument. To separate the procedural and remedial features of Title III in this context would be inconsistent with the plurality's view that "the procedures and remedies of the statute were to completely occupy the wiretapping field" as defined in "further judicial pronouncements * * *." *Id.,* 170 U.S.App.D.C. at 73, 516 F.2d at 666 (emphasis deleted). We do not think Congress intended to provide in Title III a civil remedy for constitutional violations not subject to any other provisions of the statute.

**56.** It might be argued that appellants here are entitled to the benefit of our decision in *Zweibon I* even if the rule announced is otherwise restricted to prospective application. This approach was followed by this court when it modified the standard for criminal insanity in *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), and by the Supreme Court in applying the exclusionary rule to the states in *Mapp v. Ohio, supra* note 14, and *Linkletter v. Walker, supra* note 14. *See Li v. Yellow Cab Co.,* 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226, 1244 (1975) (overruling prospectively, with exception for plaintiff in that case, rule of contributory negligence). Two reasons for such a course have been offered: (1) unless the new rule is applied to the case at hand it represents "mere *dictum*," and (2) unless litigants can expect the benefit of rules announced in their cases, they will lack incentive to bring suits challenging old rules. *Molitor v. Kaneland Community Unit District No. 302,* 18 Ill.2d 11, 163 N.E.2d 89, 97–98 (1959). Critics insist, however, that a "purely" prospective overruling will be understood as more than dictum, while adequate incentives for litigation already exist, including the presumption of retroactive effect. Moreover, the "this-litigant" exception may impose a substantial burden on the defendant in such cases, a burden that no other similarly situated individuals must carry. *See* Traynor, *supra* note 15, 28 Hastings L.J. at 559–562; Currier, *Time and Change in Judge-Made Law: Prospective Overruling,* 51 Va.L. Rev. 201, 215–216 (1965); Keeton, *Creative Continuity in the Law of Torts,* 75 Harv.L.Rev. 463, 490–491 (1962). Because our decisions in this litigation have granted these plaintiffs substantial opportunity to seek redress for injuries they may have suffered, there is no need for such an exception to our limitation to prospective effect of the *Zweibon I* plurality's position on the statutory question.

**57.** We decline appellants' invitation to assign this case to a different judge on remand. We are confident that the District Judge will follow this court's rulings and will faithfully discharge his judicial obligations.